**FOR PUBLICATION**



FILED
Oct 07 2013, 6:01 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LYLE R. HARDMAN**
Hunt Suedhoff Kalamaros, LLP
South Bend, Indiana

ATTORNEY FOR APPELLEE:

**MICHAEL RILEY**
Rensselaer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

THE ESTATE OF RICHARD A. MAYER, and )
SPANGLER, JENNINGS & DOUGHERTY, )
                                              )
    Appellants-Defendants. )
                                              )
               vs. )     No. 37A03-1207-PL-323
                                                )
LAX, INC., and DAVID LASCO, )
                                              )
    Appellees-Plaintiffs. )

APPEAL FROM THE JASPER CIRCUIT COURT
The Honorable John D. Potter, Judge
Cause No. 37C01-0704-PL-168

**October 7, 2013**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

The Estate of Richard Mayer ("the Estate") and the law firm of Spangler, Jennings & Dougherty, P.C. ("Spangler Jennings") appeal the trial court's denial of their motion for summary judgment against Lax, Inc., and David Lasco. We affirm in part, reverse in part, and remand.

## Issues

The dispositive issues we address are:

I.  whether statements made by Mayer in counterclaims filed against Lax and Lasco were absolutely privileged and thus cannot support Lax and Lasco's claims for defamation, abuse of process, malicious prosecution, negligent supervision and/or retention, tortious interference with a business relationship, and tortious interference with a contract;

II.  whether Lax and Lasco's claim against Spangler Jennings for malicious prosecution survives Mayer's death;

III.  whether there are any genuine issues of material fact precluding summary judgment in favor of the Estate and Spangler Jennings on Lax and Lasco's abuse of process claim; and

IV.  whether Lax and Lasco may seek punitive damages against the Estate and/or Spangler Jennings.

## Facts

This case has its origins in litigation and construction disputes from the 1990s. Lasco is the principal owner of Lax, which specializes in real estate development in northern Indiana. Lax hired a company called J. Metro Excavating ("JME") to perform

2

work on a project, but JME walked off the job in 1998 without completing its work. Litigation ensued; Lax sued JME for breach of contract and intentional interference with a prospective economic advantage, while JME filed a counterclaim alleging breach of contract and fraud by Lax ("the first lawsuit"). On April 26, 2004, a jury returned a verdict of $667,041 in favor of Lax on its complaint and a verdict of $47,198 in favor of JME on its counterclaim. JME initiated an appeal from this judgment but did not pursue it, and the appeal was dismissed.

Lax and Lasco subsequently began proceedings supplemental to recover its net judgment against JME, but discovered that JME's assets had previously been entirely transferred to a new entity, Metro Excavating Corporation ("MEC"), which was owned by the sons of the JME owner. On October 22, 2004, Lax and Lasco sued JME and MEC and the owners of those companies, alleging that they had committed fraud and violations of Indiana's RICO and Bulk Sales Acts, and that MEC was a mere instrumentality of JME ("the second lawsuit"). On December 29, 2004, Mayer prepared and filed an answer on behalf of JME and MEC.[1] Mayer was an attorney and shareholder in Spangler Jennings. The answer included a counterclaim against Lax and Lasco, which stated:

> 1. The plaintiff, David Lasco, hereinafter referred to as the "counterdefendant" on behalf of himself and Lasco [sic], Inc., and his other entities and partners entered into and developed a scheme, plan and conspiracy to default [sic] the defendant. The counterdefendants solicited the aid of his engineer, lawyers, and other individuals to perpetrate a fault [sic] upon the Court, a jury, and the defendant with the

---

[1] There is no designated evidence in the record that anyone besides Mayer worked in preparing and filing this counterclaim.

3

specific intent of extracting monetary compensation from the defendant.

2. Counterdefendant, through his conduct and the conduct of co-conspirators perpetrated a series of transactions that violated the Indiana Law Act, including the Indiana RICO Act.

3. The counterdefendant with the aid of others developed a pattern of action during the trial of Lax, Inc. against J. Metro Excavating, Inc. so as to falsely present evidence and testimony that work on the Double Tree site, which was the subject matter of the litigation, was performed in accordance with a 1996 grading plan when in fact the counterdefendants and co-conspirators knew that the work was done in accordance with a new plan that included work not agreed upon by J. Metro Excavating, Inc. This fraudulent scheme and practice was perpetrated for the sole purpose of obtaining a judgment against J. Metro Excavating, Inc., which was predicated upon fraud, perjury, false testimony and false facts.

App. pp. 616-17. The counterclaim sought compensatory and punitive damages against Lax and Lasco. On August 5, 2005, the trial court dismissed this counterclaim under Indiana Trial Rule 12(B)(6) on the basis that it was "an impermissible collateral attack upon the judgment of the Lake Superior Court in a different action pending between the parties." Id. at 619.

On August 17, 2005, Mayer filed an amended counterclaim on behalf of JME and MEC, which stated:

1. That the Plaintiff, David Lasco, hereinafter referred to as "Counter Defendant" for a period of some years to the present, engaged in the development and execution of a scheme, plan and conspiracy to commit, and to conspire to

4

commit, aid and abet in bribery, perjury, obstruction of justice, intimidation, and business corruption and influence.

2.    That Counter Defendant did attempt and/or did develop a pattern of racketeering activities for the purposes of perpetrating bribery, perjury, false testimony, intimidation, obstruction of justice, and business corruption upon third parties, including J. Metro Excavating, Inc.

3.    That Counter Defendant, through a scheme of enterprises, including corporations, partnerships, and limited partnerships, attempted and/or created a pattern of racketeering activity by acquiring or maintaining either directly or indirectly an interest or control in such enterprises.

4.    That Counter Defendant employed or associated with such enterprises knowingly or intentionally conducted or otherwise participated in activities which the enterprise developed in a pattern of racketeering activities.

5.    That Counter Defendant knowingly or intentionally received proceeds directly or indirectly derived from a pattern of racketeering activities and used or invested those proceeds in properties acquired by Counter Defendant or established and operated enterprises acquired by Counter Defendant.

6.    That Counter Defendant abused the judicial process and laws of Indiana in the promoting of his enterprises and activities.  Through intimidation, bribery, false statements, perjury, and treats [sic], Counter Defendant committed harm and damage to third parties, including the Counter Claimant.

7.    That Lasco, [sic] Inc., Counter Defendant, was just one of the enterprises developed and used by David Lasco for the promotion of his racketeering and wrongful activities, in violation of Indiana law and the Indiana RICO act.

Id. at 621-22.  Again, this counterclaim sought compensatory and punitive damages against Lax and Lasco.

On May 18, 2006, the trial court granted Lax and Lasco's summary judgment motion with respect to the amended counterclaim, concluding that it was barred by res judicata because its arguments could have been raised and litigated in the prior lawsuit. The trial court also found there was no evidence of any recoverable damages as a result of any alleged racketeering activity by Lax and Lasco. There was no appeal from this ruling. Lax and Lasco's claims against JME and MEC remained pending until April 2008, when the case was settled. On January 7, 2009, upon Lax and Lasco's motion, the trial court ordered both the original and amended counterclaims sealed and prohibited from public access because of the damaging allegations they contained.

At roughly the same time as Lax and Lasco were embroiled in the litigation with JME and MEC, Lasco was pursuing an opportunity to construct a casino in northwest Indiana on behalf of the Miami Tribe of Oklahoma ("MTO"). Lasco dealt with the MTO through a separate entity created specifically for the casino project, Northwest Indiana Consultants, LLC ("NIC"). NIC entered into a consulting contract with the MTO on January 26, 2006. At some point, Lasco withdrew from involvement with the casino project. Lasco claims his interest in managing the casino project, if it came to fruition, was worth $13 million. Lasco contends he withdrew from the project because of damage to his reputation caused by the counterclaims filed by Mayer.

On December 21, 2006, Lax and Lasco filed the present suit against JME, Mayer, and Spangler Jennings, raising various claims related to the counterclaims Mayer had filed in the second lawsuit. Mayer died in November 2008. Lax and Lasco subsequently

6

filed two amended complaints. The second amended complaint sued only the Estate and Spangler Jennings, there being no allegation or evidence that JME was involved with or had in any way approved Mayer's filing of the counterclaims. This complaint listed the following claims against the Estate and Spangler Jennings combined: defamation; abuse of process; malicious prosecution; tortious interference with a contract; and tortious interference with a business relationship. The complaint also stated claims against Spangler Jennings for negligent supervision and/or retention of Mayer, and alleged that Spangler Jennings was both directly liable for the counterclaim filings and liable under agency principles for Mayer's conduct. The complaint sought compensatory and punitive damages against both the Estate and Spangler Jennings.

On September 3, 2010, the Estate and Spangler Jennings moved for summary judgment. Lax and Lasco filed a response and the trial court held a hearing on the matter. On April 19, 2012, the trial court entered its order on the motion. It granted summary judgment to the Estate only on Lax and Lasco's claims for defamation and malicious prosecution, but it denied summary judgment to Spangler Jennings as to those claims. The trial court also rejected the Estate and Spangler Jennings's argument that the statements made in the counterclaims by Mayer were absolutely privileged. It further concluded that there were genuine issues of material fact precluding summary judgment for the Estate and Spangler Jennings on the claims of abuse of process, negligent supervision and retention, and the tortious interference claims. It also held that Lax and Lasco were not precluded from seeking punitive damages against both the Estate and

7

Spangler Jennings. The trial court certified its non-final order for interlocutory appeal, and this court agreed to accept jurisdiction of it.

## Analysis

Before turning to the merits, we address two preliminary procedural issues. First, Lax and Lasco ask this court to reconsider its decision to accept jurisdiction over this interlocutory appeal. Although the Estate and Spangler Jennings suggest that this is an entirely inappropriate request, it is not unheard of. Specifically, "in rare instances reconsideration of motions to accept or oppose discretionary interlocutory appeals may be appropriate, such as where a successive motion demonstrates good cause why the motions panel's initial ruling should be reconsidered." Bridgestone Americas Holding, Inc. v. Mayberry, 854 N.E.2d 355, 360 (Ind. Ct. App. 2006), summarily aff'd in relevant part, 878 N.E.2d 189, 191 n.2 (Ind. 2007). This court, while reluctant to overrule orders issued by the motions panel, does have inherent authority to reconsider any decision while an appeal remains pending. Simon v. Simon, 957 N.E.2d 980, 987 (Ind. Ct. App. 2011). "This is especially true where, . . . after considering a more complete record than was available to the motions panel, and the appellate briefs, we have determined there is clear authority establishing that the motions panel erred." Id. In Simon, we dismissed a discretionary interlocutory appeal when it became clear after briefing that the appellant did not have standing to pursue the appeal. Id. at 989-90.

Here, Lax and Lasco do not point to any clear legal error by the motions panel in permitting this interlocutory appeal to proceed, as was the case in Simon. In fact, it is not

8

entirely clear why Lax and Lasco think this appeal should not proceed. They seem to argue that if any part of the trial court's summary judgment ruling is reversed, we will have permitted the Estate and Spangler Jennings to have collaterally attacked the judgments in the first two lawsuits. That argument ignores that this suit was initiated by Lax and Lasco to recover damages from the Estate and Spangler Jennings for allegedly defamatory statements; the Estate and Spangler Jennings are not at this time attempting to attack the judgments in the previous two cases. Additionally, much time and expense has been invested in briefing and arguing this case in reliance upon this court's decision to hear the case. We cannot perceive a legal basis for overturning the motions panel's decision to accept jurisdiction over this interlocutory appeal.

Second, Lax and Lasco complain that the Estate and Spangler Jennings have acted improperly by relating the contents of the second lawsuit counterclaims in their briefs and other materials in this appeal after the trial court in the second lawsuit ordered the contents of those counterclaims to be sealed and excluded from public access. According to Indiana Administrative Rule 9(G)(4), an appellant must give this court notice that all or part of a record in a case has been excluded from public access by trial court order and references to the excluded material are supposed to be filed in accordance with the "green paper" rule. The Estate and Spangler Jennings did not notify this court that they were relying upon materials excluded from public access in this appeal, nor did they comply with the "green paper" rule. On the other hand, the trial court order partially sealing the

9

record was made in the second lawsuit; nothing in the present case was excluded from public access.

Additionally, material excluded from public access by trial court order may nonetheless be made public on appeal if this court determines that:

> (A) the [trial court order] was improper or is no longer appropriate,
>
> (B) public disclosure of the information is essential to the resolution of the litigation, or
>
> (C) disclosure is appropriate to further the establishment of precedent or the development of the law . . . .

Ind. Admin. Rule 9(G)(4)(c)(ii). It is very difficult, if not impossible, to assess the validity of Lax and Lasco's claims, and the Estate and Spangler Jennings's defenses to those claims, without relating the content of the challenged counterclaims filed by Mayer in the second lawsuit, which are presently under trial court seal. We also note that Lax and Lasco initiated the present litigation, which is based solely upon the allegations in the counterclaims, and thus risked further exposure of the counterclaims' allegations. We conclude that the sealing order in the second lawsuit should not be given continuing effect in this appeal, as disclosure of the contents of the counterclaims is both "essential to the resolution of the litigation" and "appropriate to further the establishment of precedent or the development of the law . . . ." Id.

Turning to the merits, the standard of review for the grant or denial of a motion for summary judgment is the same as it is for the trial court originally ruling on the motion:

10

whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Kroger Co. v. Plonski, 930 N.E.2d 1, 4-5 (Ind. 2010). Summary judgment should be granted only if the designated evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id. at 5. "All factual inferences must be construed in favor of the non-moving party, and all doubts as to the existence of a material issue must be resolved against the moving party."[2] Id.

## I. Absolute Privilege

### A. General Availability of Privilege

The Estate and Spangler Jennings argue that all of Lax and Lasco's claims are barred pursuant to the so-called "absolute privilege" that has been found to exist for allegedly defamatory statements made in the course of a judicial proceeding. "Indiana law has long recognized an absolute privilege that protects all relevant statements made in the course of a judicial proceeding, regardless of the truth or motive behind the statements." Hartman v. Keri, 883 N.E.2d 774, 777 (Ind. 2008). This privilege is founded on the necessity of preserving the due administration of justice by providing actors in judicial proceedings with the freedom to participate in them without fear of future defamation claims. Id. Statements made by parties in pleadings and other court

---

[2] Consistent with this standard of review, we will assume that Mayer had no factual basis for making the allegations in the second lawsuit counterclaims. The Estate and Spangler Jennings direct us to no designated evidence that any of the allegations made in the counterclaims were true, although they suggest that such evidence does exist.

11

filings enjoy this privilege "if the statements are pertinent and relevant to the litigation." Miller v. Reinert, 839 N.E.2d 731, 735 (Ind. Ct. App. 2005), trans. denied. Whether statements made in judicial pleadings are pertinent and relevant is a question of law. Id. Courts favor a liberal rule in favor of finding statements to be relevant and pertinent. Id. Statements in a judicial proceeding will not enjoy an absolute privilege only if they are so palpably irrelevant to the subject matter of the case that no reasonable person could doubt their irrelevancy and impropriety. Id. "Lawsuits are not peace conferences. Feelings are often wounded and reputations are sometimes maligned." Briggs v. Clinton County Bank & Trust Co. of Frankfort, Ind., 452 N.E.2d 989, 998 (Ind. Ct. App. 1983).

Lax and Lasco seem to assert in part that the irrelevancy of the second lawsuit counterclaims was established by the trial court in that action dismissing the first filed counterclaim as an impermissible collateral attack on the first lawsuit's judgment, granting summary judgment on the amended counterclaim on a res judicata basis, and then ordering the sealing of both counterclaims for their prejudicial content.[3] It is, in fact, true "'that a litigant defeated in a tribunal of competent jurisdiction may not maintain an action for damages against his adversary or adverse witnesses on the ground the judgment was obtained by false and fraudulent practices or by false and forced evidence.'" South Haven Sewer Works, Inc. v. Jones, 757 N.E.2d 1041, 1045 (Ind. Ct.

---

[3] Lax and Lasco also argue that allowing the Estate and Spangler Jennings to claim an absolute privilege for the contents of the counterclaims would allow them to "re-litigate" the verdict in the first lawsuit and the rulings in the second lawsuit. Appellee's Br. p. 19. That argument is somewhat confusing, in that allowing the absolute privilege to bar the current lawsuit brought by Lax and Lasco would have no effect on the results in the first and second lawsuits.

12

App. 2001) (quoting Dodd v. Estate of Yanan, 625 N.E.2d 456, 457 (Ind. 1993)).  It does not appear, however, that a ruling finding a pleading's allegations to be legally invalid, for res judicata or other reasons, necessarily establishes that the pleading's contents were so palpably irrelevant to the litigation.  Lax and Lasco cite no authority to that extent.  To the contrary, courts in other jurisdictions have noted that the absolute privilege for statements made during judicial proceedings is not dependent upon the allegations being relevant "in the technical legal sense."  Defend v. Lascelles, 500 N.E.2d 712, 715 (Ill. App. Ct. 1986), app. denied.  In other words, simply because a case is subject to dismissal or summary judgment for being legally unsound does not mean the absolute privilege evaporates.  This would improperly eliminate the privilege in a vast number of cases.

The parties differ as to the effect of the case of Stahl v. Kincade, 135 Ind. App. 699, 192 N.E.2d 493 (1963).  That case established the principal in Indiana for the first time that in order for the "absolute privilege" to apply, statements made during litigation must be "relevant and pertinent to the litigation or bear some relation thereto."  Stahl, 135 Ind. App. at 707, 192 N.E.2d at 497.  In that case, a plaintiff filed suit against defendants for nuisance and trespass, and the defendants filed a counterclaim alleging the plaintiff was living in an adulterous relationship with a married man and seeking an injunction prohibiting the plaintiff from doing so.  The plaintiff sued the defendants for libel based on the allegations in the counterclaim.  On appeal, this court held that the allegations in the counterclaim were "not relevant or pertinent to the matter in controversy and had no relation thereto" and that the defendants "did not have reasonable or probable cause to

13

believe the matter to be relevant or pertinent," and thus the allegations were not absolutely privileged. Id. at 708, 192 N.E.2d at 497.

The Estate and Spangler Jennings suggest Stahl was overruled by the adoption of Indiana Trial Rule 13(B) in 1971. Rule 13(B), the permissive counterclaim rule, allows "as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject-matter of the opposing party's claim." Thus, the Estate and Spangler Jennings contend, because it is clear that a permissive counterclaim may raise claims wholly unrelated to a plaintiff's complaint, there is no need for allegations in a counterclaim to be "relevant or pertinent" to the litigation in order for the absolute privilege to apply. However, numerous cases decided after 1971, including cases from the Indiana Supreme Court, have continued to refer to the "relevant and pertinent" requirement for the absolute privilege to apply. See, e.g., Hartman, 883 N.E.2d at 777; Miller, 839 N.E.2d at 735.

Regardless, we believe that whether the absolute privilege applies is not dependent upon whether allegations were made in an original complaint, or a counterclaim, or a crossclaim. In other words, relevancy is not necessarily measured with respect to the pleadings of an opposing party, but with respect to a cause of action or defense raised by the party claiming the privilege. Here, Mayer accused Lax and Lasco of engaging in conduct violating RICO laws (as Lax and Lasco had accused JME and MEC of doing). Mayer was entitled to bring a private RICO cause of action against Lax and Lasco. See AGS Capital Corp., Inc. v. Product Action Intern., LLC, 884 N.E.2d 294, 308 (Ind. Ct.

14

App. 2008) (citing Ind. Code § 34-24-2-6), <u>trans. denied</u>. Mayer's allegations in the counterclaims, while no doubt inflammatory, were related to that stated cause of action. Additionally, to the extent Mayer was attempting to set aside the first lawsuit's verdict by alleging fraudulent conduct by Lax and Lasco, he would have been entitled to publicly make such claims under Indiana Trial Rule 60(B)(3), and the allegations of the counterclaims are related to those claims. That Mayer used an incorrect procedural vehicle for setting aside a verdict, and in fact could not recover damages on his claims, does not render the contents of the counterclaims unprivileged.

The statements Mayer made in the counterclaims would have been equally privileged if he had filed them in an original complaint or in a motion to set aside the first verdict. We can conceive of hypothetical statements Mayer could have made that would have been completely irrelevant to his stated causes of action and may not have been protected by an absolute privilege—statements that had nothing to do with a RICO claim or claim of fraud in procurement in the first verdict. There are no such allegations in the counterclaims. As such, we hold that the allegations were protected by the absolute privilege for statements made during judicial proceedings.

## B. Extent of Privilege

That is not the end of this case, however. We must still determine whether the Estate and Spangler Jennings may claim the protection of the absolute privilege as a defense to all of Lax and Lasco's causes of action. In a footnote of their brief, the Estate and Spangler Jennings claim the absolute privilege would bar all of Lax and Lasco's

claims. For this proposition they cite <u>Williams v. Tharp</u>, 914 N.E.2d 756 (Ind. 2009).

That case, however, dealt with the "qualified privilege" for reporting suspected crimes to

law enforcement, not the "absolute privilege" for statements made during judicial

proceedings. Moreover, the alleged torts in <u>Williams</u> were defamation, false

imprisonment, intentional infliction of emotional distress, and negligence. <u>See</u> <u>id.</u> at 769.

The majority of the other cases the Estate and Spangler Jennings cite on the issue of

"absolute privilege" were defamation, libel, or slander cases. <u>See, e.g.</u>, <u>Chrysler Motors</u>

<u>Corp. v. Graham</u>, 631 N.E.2d 7 (Ind. Ct. App. 1994), <u>trans. denied</u>. Other torts related to

defamation, or relying upon defamatory statements as proof of wrongdoing, may also be

barred by the absolute privilege. <u>See</u> <u>Hartman</u>, 883 N.E.2d at 776-77 (holding absolute

privilege barred claims for libel, slander, and malicious interference with an employment

contract). Thus, we conclude that the absolute privilege bars Lax and Lasco's actions for

defamation, negligent supervision and retention, tortious interference with a business

relationship, and tortious interference with a contract. The trial court erred in not

entering summary judgment in favor of the Estate and Spangler Jennings on those

claims.[4]

---

[4] Lax and Lasco clearly cannot pursue a negligent supervision and/or retention case against Spangler Jennings for another reason. The law in Indiana is well-settled that there is no cause of action for negligent hiring and/or retention when an employer has stipulated that an employee was acting within the scope of employment when an alleged tort was committed. <u>Board of School Comm'rs of City of Indianapolis v. Pettigrew</u>, 851 N.E.2d 326, 332 (Ind. Ct. App. 2006), <u>trans. denied</u>. Spangler Jennings has stipulated that Mayer was acting within the scope of his employment when he filed the counterclaims, thus obviating the negligent hiring and/or retention claim. <u>See</u> <u>id.</u> Lax and Lasco have failed to convince us that we should ignore that stipulation.

Whether the absolute privilege should be used to defeat claims for malicious prosecution or abuse of process requires much more detailed consideration. The elements of malicious prosecution are: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor. Crosson v. Berry, 829 N.E.2d 184, 189 (Ind. Ct. App. 2005), trans. denied.[5] An abuse of process claim requires a showing that a defendant had: (1) an ulterior purpose or motives; and (2) a willful act in the use of process not proper in the regular conduct of a proceeding. Watson v. Auto Advisors, Inc., 822 N.E.2d 1017, 1029 (Ind. Ct. App. 2005), trans. denied.

Those causes of action are based on the malicious or abusive use of the judicial system and are not subject to an absolute privilege. As our supreme court has stated, although it is preferable to give lawyers "broad protection from those who believe the lawyer has made wrongful use of the judicial process . . . , attorneys have not been clothed with absolute protection from liability for all of the actions they take on behalf of clients" if, for example, they have engaged in fraud, collusion, or tortious conduct against third parties. National City Bank, Indiana v. Shortridge, 689 N.E.2d 1248, 1251 (Ind. 1997) (addressing abuse of process claim). Under this language, not everything a lawyer files in court on behalf of a client is absolutely privileged from being the subject of a lawsuit by a third party. In other words, if actions for malicious prosecution and abuse of

---

[5] Crosson also established that a malicious prosecution action can be based on the filing of a counterclaim. Crosson, 829 N.E.2d at 191.

17

process are to be allowed, it would seem that statements made in judicial proceedings must be a part of those actions and cannot be barred by an absolute privilege.

This court, in fact, has explicitly held that even if an absolute privilege applies for statements made during a judicial proceeding and bars an action for defamation, an aggrieved party "may file an action for 'wrongful civil proceedings' if the proceedings are terminated in his favor and were initiated without probable cause and for an improper purpose." Briggs, 452 N.E.2d at 998. Also, in Trotter v. Indiana Waste Systems, Inc., 632 N.E.2d 1159, 1164-65 (Ind. Ct. App. 1994), this court held that absolute privilege barred a plaintiff's action for slander of title but then went on to separately address whether there was a genuine issue of fact on the plaintiff's malicious prosecution claim without giving any indication that that claim was barred by the absolute privilege. A vast number of other jurisdictions also hold that even where an absolute privilege bars an action for defamation based on statements made during a judicial proceeding, it does not bar an action for malicious prosecution. See Hogen v. Valley Hosp., 195 Cal. Rptr. 5, 7 (Cal. Ct. App. 1983); Goldstein v. Serio, 496 So. 2d 412, 414-15 (La. Ct. App. 1986), writ denied; Keys v. Chrysler Credit Corp., 494 A.2d 200, 204 (Md. 1985); McKinney v. Okoye, 806 N.W.2d 571, 579 (Neb. 2011); Rainier's Dairies v. Raritan Val. Farms, 117 A.2d 889, 895 (N.J. 1955); Mantia v. Hanson, 79 P.3d 404, 408-09 (Or. Ct. App. 2003); Crowell v. Herring, 392 S.E.2d 464, 468 (S.C. Ct. App. 1990). We see no reason to depart from this wealth of authority and, thus, hold that the absolute privilege for

18

communications made during a judicial proceeding does not bar Lax and Lasco's cause of action for malicious prosecution arising from such communications.

The case law regarding absolute privilege and abuse of process claims is not as overwhelmingly uniform. In one case, this court applied an absolute privilege defense to defeat an abuse of process claim. Miller, 839 N.E.2d at 735. In that case, however, there was no appellee's brief filed and no analysis or discussion of whether an absolute privilege should defeat a cause of action for abuse of process. We therefore find it of little persuasive value on this issue. We observe that in Shortridge, although our supreme court did not use the phrase "absolute privilege," it did discuss the "broad protection" given to attorneys representing clients in judicial proceedings and acknowledged the strict "technical requirements" for proceeding with either a malicious prosecution or abuse of process cause of action, but still held that in proper circumstances a cause of action will lie against an attorney for abuse of process. Shortridge, 689 N.E.2d at 1251-52. We read this case as clearly indicating that in Indiana, the defense of absolute privilege does not apply to properly-stated and proven causes of action for abuse of process. See also Alexandru v. Dowd, 830 A.2d 352, 355 (Conn. App. Ct. 2003), certification denied; Isobe v. Sakatani, 279 P.3d 33, 50 (Haw. Ct. App. 2012); Goldstein, 496 So.2d at 414-15; McGranahan v. Dahar, 408 A.2d 121, 128 (N.H. 1979); Superior Constr., Inc. v. Linnerooth, 712 P.2d 1378, 1382 (N.M. 1986); but see Umansky v. Urquhart, 148 Cal. Rptr. 547, 549 (Cal. Ct. App. 1978) (holding absolute privilege applies to abuse of process claims). We conclude that, as with the malicious prosecution

19

claim, Lax and Lasco's cause of action for abuse of process is not barred by an absolute privilege.

## II. *Malicious Prosecution Claim Against Spangler Jennings*

Lax and Lasco concede that the malicious prosecution action against the Estate is barred by Mayer's death. Indiana Code Section 34-9-3-1(a) ("the Survival Statute") provides:

> If an individual who is entitled or liable in a cause of action dies, the cause of action survives and may be brought by or against the representative of the deceased party except actions for:
>
> (1) libel;
>
> (2) slander;
>
> (3) malicious prosecution;
>
> (4) false imprisonment;
>
> (5) invasion of privacy; and
>
> (6) personal injuries to the deceased party;
>
> which survive only to the extent provided in this chapter.

However, Lax and Lasco argue, and the trial court concluded, that the malicious prosecution claim against Spangler Jennings is still viable. Lax and Lasco contend that they may proceed on their malicious prosecution claim against Spangler Jennings under either a respondeat superior or direct liability theory.[6]

---

[6] Respondeat superior is the tort theory of vicarious liability that applies in the context of employer-employee or "master-servant" relationships. Columbus Reg'l Hosp. v. Amburgey, 976 N.E.2d 709, 714

20

We first note that our supreme court has stated, "The inconvenience and hardship of the common-law rule relating to remedies on the death of a party has resulted quite generally . . . in the adoption of liberal statutes in regard to the survival and revival of actions." Crawfordsville Trust Co. v. Ramsey, 178 Ind. 258, 267, 98 N.E. 177, 180-81 (1912). It further held that survival statutes should be liberally construed in favor of the survival of actions when possible. Id. Keeping that maxim in mind, we examine the facts here.

## A. Respondeat Superior

The law in Indiana is unclear as to whether the death of an agent and subsequent barring of a cause of action because of that death also bars a cause of action against the principal, where the principal's liability is wholly dependent upon the agent's conduct. The general rule has been stated that if a "servant or agent is released of liability, no liability can be imputed to the principal," and that a judgment in favor of an employee requires judgment in favor of the employer if the employer's liability is based solely upon the employee's acts. Comer-Marquadt v. A-1 Glassworks, LLC, 806 N.E.2d 883, 887 (Ind. Ct. App. 2004). Our supreme court has said that the reason for this general rule is that because, under the doctrine of respondeat superior, an employer has a right of action for indemnity against an employee if the employer is found liable for the employee's conduct, "'and such right would be defeated by a verdict and judgment which released

(Ind. Ct. App. 2012). Respondeat superior liability arises when an employee commits a wrongful act within the scope of his or her employment. Id. Spangler Jennings has stipulated that Mayer was acting within the scope of his employment when he prepared and filed the counterclaims.

21

the [employee].'" Health & Hosp. Corp. of Marion County v. Gaither, 272 Ind. 251, 260, 397 N.E.2d 589, 595 (1979) (quoting Childress v. Lake Erie & W. R. Co., 182 Ind. 251, 256, 105 N.E. 467, 469 (1914)).

However, the only Indiana case that appears to have directly addressed the specific issue of an employee's death and the vicarious liability of an employer is Biel, Inc. v. Kirsch, 130 Ind. App. 46, 153 N.E.2d 140 (1958). In that case, the driver of an automobile belonging to Biel, Inc., caused an accident with a motorcycle driven by Kirsch. Kirsch sued both the driver and Biel, Inc. under a respondeat superior theory. The driver died before trial, and Kirsch dismissed the driver's estate from the action, because recovery against the estate was limited to $1,000 by the version of the Survival Statute in effect at the time. Kirsch subsequently obtained a judgment solely against Biel, Inc., for $17,000. On appeal, this court held that the liability of Biel, Inc., as master could not exceed that of the deceased driver. It stated in part, "Why . . . isn't it logical to say that a statute that partially relieves a dead tort feasor's estate from liability to an injured person will automatically relieve the tort feasor's master to a similar extent where the master's liability is predicated solely upon the doctrine of respondeat superior." Biel, 130 Ind. App. at 53-54, 153 N.E.2d at 143-44. This court reversed the judgment against Biel, Inc.

Biel relied in large part upon Boor v. Lowery, 103 Ind. 468, 3 N.E. 151 (1885). Boor stated the rule, "That an action the purpose of which is to recover for an injury to the person cannot be maintained after the death of the person committing the injury is, we

22

think, supported by all the authorities . . . ." Boor, 103 Ind. at 473, 3 N.E. at 153. In accordance with this rule, the Boor court reversed a medical malpractice judgment against the estate of a deceased surgeon. Id. at 476, 3 N.E. at 155. However, the court declined to hold that the injured plaintiff was barred from seeking recovery against the deceased surgeon's medical practice partner. Id., 3 N.E. at 155-56. Instead, it stated that the surgeon's death "did not ipso facto abate the action as to his co-defendant" and that something other than the fact of the surgeon's death would be required to end the action as to his partner. Id., 3 N.E. at 156. Thus, Boor does not support Biel's holding that the death of an alleged tortfeasor automatically causes the action to abate as to other parties who may be jointly liable with the tortfeasor.

The subsequent procedural history of Biel is unusual. Our supreme court denied transfer on July 1, 1959. However, that denial of transfer was accompanied by an opinion from two justices, stating their belief that this court's reasoning was incorrect. The opinion stated in part:

> The fact that upon the death of an agent the liability in a negligence case is limited or extinguished against his estate, should not accrue to the benefit of the principal and release the principal also from liability.
>
> There is no analogy in the instant case and one in which a jury or court finds the agent not guilty of negligence for which the principal at the same time is held liable. The negligence still exists, even though the agent may die or his liability be limited by statute in the case before us.

* * * * *

23

> It likewise follows that a privilege personal to an agent or his estate may not be claimed or taken advantage of by a principal to avoid liability.

Biel, Inc. v. Kirsch, 159 N.E.2d 575, 575-76 (Ind. 1959) (Arterburn & Landis, JJ., concurring).

On October 27, 1959, the court issued an order dismissing a petition for rehearing on the transfer decision and withdrew the previous opinion on the denial of transfer. Accompanying that order, however, was a unanimous per curiam opinion stating, "While we do not approve of the reasoning of the Appellate Court in its opinion it appears in 153 N.E.2d 140, we do, however, concur in the result reached in that court." Biel, Inc. v. Kirsch, 240 Ind. 69, 70, 161 N.E.2d 617, 618 (1959). The court explained that it believed the driver of the Biel, Inc., vehicle was not acting within the scope of employment or as the company's agent at the time of the accident and, therefore, the company could not be liable for the driver's conduct. Id. at 73, 161 N.E.2d at 618. The court did not address the issue of whether the driver's death would have caused the action against the employer to terminate.

We believe that although Spangler Jennings vigorously argues otherwise, it is clear that this court's reasoning in Biel was unanimously rejected by our supreme court. In fact, two different Indiana federal district court judges reached the conclusion that this court's reasoning in Biel was repudiated by our supreme court. See Bingaman v. Gordon Baking Co., 186 F. Supp. 102, 104 (N.D. Ind. 1960); Parrott v. Ellis Trucking Co., 179 F. Supp. 534, 535 (S.D. Ind. 1960). Another federal district court more recently reached the

24

same conclusion regarding <u>Biel</u> and cited the original concurring opinion from the denial of transfer as persuasive authority in holding that abatement of an action against an agent because of death does not cause the action to terminate as to the principal. <u>Schimpf v. Gerald, Inc.</u>, 2 F. Supp. 2d 1150, 1159-60 (E.D. Wis. 1998).

Spangler Jennings notes that the Survival Statute was amended in 1959, and that the legislature at that time (nor at the time of subsequent amendments in 1982, 1989, and 1998) did not add any language purporting to overrule this court's decision in <u>Biel</u>. Spangler Jennings argues that if the legislature had disagreed with <u>Biel</u>, it could have acted to overrule it, but it did not. <u>See</u> <u>Durham ex rel. Estate of Wade v. U-Haul Int'l</u>, 745 N.E.2d 755, 761 (Ind. 2001) (noting that "When it disagrees with judicial rulings, the legislature can act."). However, the Survival Statute, since its original inception in the 1800s, has always been silent on the issue of vicarious liability, both before and after <u>Biel</u>. And, given that our supreme court expressly disagreed with this court's reasoning in <u>Biel</u>, the legislature may have deemed it unnecessary to address that reasoning, either by adopting it or rejecting it. We take no guidance from the legislature's failure to amend the Survival Statute after <u>Biel</u>.

We have not been able to find any case from any jurisdiction that comports with this court's original decision in <u>Biel</u>. When the issue has been directly addressed, the cases uniformly hold that termination of an action against an agent-tortfeasor because of death does not cause the action to terminate against a principal. Such cases include, in addition to <u>Bingaman</u> and <u>Parrott</u> and <u>Schimpf</u>: <u>Soraghan v. Henlopen Acres, Inc.</u>, 236

25

F. Supp. 489, 491 (D. Del. 1964); <u>Rogers v. Carmichael</u>, 192 S.E. 39, 47 (Ga. 1937); <u>Smith v. Republic Underwriters, Waco, Tex.</u>, 103 P.2d 858, 862 (Kan. 1940); <u>Manson v. Wabash R.R. Co.</u>, 338 S.W.2d 54, 57 (Mo. 1960); <u>Wiebe v. Seely</u>, 335 P.2d 379, 390-91 (Or. 1959); <u>Johns v. Hake</u>, 131 P.2d 933, 934-35 (Wash. 1942).  These cases generally hold that termination of an action because of an alleged agent-tortfeasor's death is not the same as a judgment on the merits or an exoneration of the agent's conduct, which would flow to the principal, but is instead a form of personal immunity from suit, which is not transferable to others.  <u>See</u> <u>Schimpf</u>, 2 F. Supp. 2d at 1160.  Also, courts have specifically rejected the argument that allowing an action to proceed against a principal after the action has terminated against the agent because of death would impede the principal's ability to seek indemnity from the agent or his estate, which is a separate issue from the principal's liability to a third party.  <u>See</u> <u>Rogers</u>, 192 S.E. at 47; <u>Wiebe</u>, 335 P.2d at 391.

We also note that numerous restatements of the law support the proposition that termination of an action against an agent because of death does not terminate an action against the principal based on the agent's conduct.  For example:

> In an action against a principal based on the conduct of a servant in the course of employment:
>
> * * * * *
>
> (b) The principal has no defense because of the fact that:
>
> * * * * *
>
> (ii) the agent had an immunity from civil liability as to the act.

26

RESTATEMENT (SECOND) OF AGENCY (1958) § 217.

Also:

> If two defendants are joined in an action for the same harm, judgment can properly be entered against one and in favor of the other, <u>except when the judgment is entered after trial on the merits</u> and the liability of one cannot exist without the liability of the other.

RESTATEMENT (SECOND) OF TORTS § 883 (1979) (emphasis added). Commentary to this provision includes:

> When the liability of one party to an action is based entirely on a wrongful act by another, a judgment necessarily based upon the finding that the first is liable and that the second is not, is inconsistent with itself unless the second party has a personal immunity or has been discharged from liability.

A different restatement provision regarding vicariously liability reads:

> (1) A judgment against the injured person that bars him from reasserting his claim against the defendant in the first action extinguishes any claim he has against the other person responsible for the conduct unless:
>
> * * * * *
>
> (b) The judgment in the first action was based on a defense that was personal to the defendant in the first action.

RESTATEMENT (SECOND) OF JUDGMENTS § 51 (1982) (emphasis added). Taken together, these provisions support the idea that a procedural defense to an action that is personal to an agent, and not based on the merits of the action, does not preclude proceeding with a cause of action against the principal under a respondeat superior theory.

27

In light of the great weight of authority, and in effecting the policy favoring survival of actions when possible, we hold that termination of a cause of action against an alleged agent-tortfeasor because of death does not require termination of a cause of action against the agent's principal. Such termination does not reflect upon the merits of the case. We see no indication in the Survival Statute that our legislature intended to permit employers or other principals to avoid liability for their employee or agent's misconduct simply because of the employee or agent's death. In the absence of legislative authority to the contrary, the immunity from liability for certain torts afforded by the Survival Statute does not transmit to a surviving principal. Likewise, it is the tortious acts of the tortfeasor that are imputed to another under respondeat superior—not the tortfeasor's liability or lack thereof. Thus, Lax and Lasco may continue to pursue their malicious prosecution action against Spangler Jennings under a respondeat superior theory.

### B. Direct Liability

We now address Lax and Lasco's argument that Spangler Jennings is also directly liable for the filing of the counterclaims. First, Lax and Lasco argue in their brief "that a 'direct action can be pursued against the attorney and his law firm by an opposing party for pleadings that rise to the level of abuse of process or malicious prosecution.'" Appellee's Br. pp. 8-9. For this proposition, Lax and Lasco cite Shortridge, 689 N.E.2d at 1252. However, this quote is from the trial court's order in this case, not from Shortridge. See App. p. 1161. In fact, Shortridge contains no discussion at all regarding when, whether, or under what circumstances a law firm may be directly liable, as

28

opposed to vicariously liable, for torts committed by one of its attorneys. <u>Shortridge</u> does not support the imposition of direct liability against Spangler Jennings.

Lax and Lasco also argue that Spangler Jennings could be directly liable for Mayer's conduct by virtue of ratification. "Ratification is the adoption of that which was done for and in the name of another without authority." <u>Maxitrol Co. v. Lupke Rice Ins. Agency, Inc.</u>, 924 N.E.2d 179, 183 (Ind. Ct. App. 2010), <u>trans. denied</u>. Ratification cures an agent's lack of authorization by the principal and causes a transaction by the agent to be authorized. <u>Id.</u> Ratification is a question of fact that requires evidence that a principal has knowingly accepted the benefits of an unauthorized transaction. <u>Id.</u> at 183-84. "A principal has the right to presume that his agent has followed instructions and has not exceeded his authority." <u>Id.</u> at 184. Even if the requirements of ratification were met here, Lax and Lasco cite no authority for the proposition that ratification is a form of direct, as opposed to vicarious, liability. Ratification only transforms an unauthorized act by an agent for which the principal would not have had any liability into one in which the principal has vicarious liability because it knowingly accepted the benefits of the agent's unauthorized conduct.

Lax and Lasco also seem to argue that Spangler Jennings is directly liable for Mayer's conduct because of his status as a shareholder in the firm, thus making Spangler Jennings and Mayer one and the same. They cite no authority for this proposition. In fact, as we will discuss, there is no evidence that Mayer held a managerial role within Spangler Jennings, which is the only circumstance under which we could envision direct

29

liability of Spangler Jennings for Mayer's conduct. We conclude that Mayer's status as a shareholder alone was insufficient to make Spangler Jennings directly liable for his conduct.

Finally, Lax and Lasco assert that Spangler Jennings is directly liable for malicious prosecution not only for Mayer's conduct, but those of other attorneys at the firm as well. Lax and Lasco have not identified any such attorneys. As support for this claim, they cite Spangler Jennings billing records dating from August 1998 through June 2004. Those records, while reflecting some work performed by other Spangler Jennings attorneys, pertain exclusively to litigation of the first lawsuit. There are no billing records pertaining to the second lawsuit and the filing of the counterclaims, which were signed only by Mayer. Those counterclaims are the exclusive basis of Lax and Lasco's claims and they have not directed this court to any evidence that any attorney other than Mayer drafted and approved their filing. In sum, we see no basis upon which Lax and Lasco can hold Spangler Jennings directly liable for the filing of the counterclaims.

### III. *Abuse of Process*

Next, the Estate and Spangler Jennings argue that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law on Lax and Lasco's abuse of process claim. A plaintiff claiming abuse of process must show a misuse or misapplication of process[7] for an end other than that which it was designed to accomplish.

---

[7] An abuse of process claim may be predicated upon the filing of a complaint. See Lindsay v. Jenkins, 574 N.E.2d 324, 326 (Ind. Ct. App. 1991).

30

Watson, 822 N.E.2d at 1029. The two elements of abuse of process are: (1) ulterior purpose or motives; and (2) a willful use of process not proper in the regular conduct of the proceedings. Id. "If a party's 'acts are procedurally and substantively[8] proper under the circumstances' then his intent is irrelevant." Id. (quoting Reichhart v. City of New Haven, 674 N.E.2d 27, 31 (Ind. Ct. App. 1996), trans. denied). There is no basis for an abuse of process claim if legal process is used to accomplish an outcome that the process was designed to accomplish. Id. "'The purpose for which the process is used is the only thing of importance.'" Shortridge, 689 N.E.2d at 1252.

"'The gravamen of [abuse of process] is not the wrongfulness of the prosecution, but some extortionate perversion of lawfully initiated process to illegitimate ends.'" Id. (quoting Heck v. Humphrey, 512 U.S. 477, 486 n.5, 114 S. Ct. 2364, 2372 n.5 (1994)). Unlike a malicious prosecution action, an action for abuse of process does not necessarily require proof that the action was brought without probable cause or that the action terminated in favor of the party alleging abuse of process. Lindsay v. Jenkins, 574 N.E.2d 324, 326 (Ind. Ct. App. 1991), trans. denied. It does appear, however, that an action's lack of validity can be highly relevant in examining an abuse of process claim. Our supreme court has held the reasonableness of an attorney's action in instituting litigation should be judged by an objective standard and whether "'no competent and reasonable attorney familiar with the law of the forum would consider that the claim was worthy of litigation on the basis of the facts known by the attorney who instituted suit.'"

---

[8] In the Estate and Spangler Jennings's brief, they omit the "and substantively" part of this test.

31

Shortridge, 689 N.E.2d at 1253 (quoting Wong v. Tabor, 422 N.E.2d 1279, 1288 (Ind. Ct. App. 1981)).[9]  There must be evidence that an attorney filed a claim for a purpose other than aiding his or her client in adjudicating his or her claim.  Id.  Additionally, there must be evidence that the attorney "'knowingly initiated proceedings for a clearly improper purpose,'" which requires more than evidence of a questionable belief as to the merits of a case, or the failure to fully investigate all facts before filing suit.  Id. (quoting Wong, 422 N.E.2d at 1987).

Applying these principles to the present case, in order to succeed upon their abuse of process claim, Lax and Lasco must prove that Mayer had an illegitimate purpose in filing the counterclaims—a purpose other than aiding his clients at the time, MEC and JME, in their dispute with Lax and Lasco.  Lax and Lasco argue that the illegitimate purpose was to harm Lasco's reputation and, specifically, his involvement in the MTO casino.  In other words, if Mayer's true motivation in filing the counterclaims was to have the first lawsuit's judgment set aside, or to recover damages for his clients, then there would be no abuse of process claim.  However, if Mayer's true motivation was to damage Lasco's reputation, there could be an abuse of process claim.

The Estate and Spangler Jennings contend that the counterclaims were procedurally proper filings under Indiana Trial Rules 13 and 15 and, therefore, cannot form the basis of an abuse of process claim.  However, the Estate and Spangler Jennings

---

[9] Wong solely addressed a claim of malicious prosecution, while Shortridge solely addressed a claim of abuse of process.  Still, the Shortridge court clearly deemed it appropriate to rely heavily upon Wong in establishing the parameters of an abuse of process claim.

provide no analysis as to whether those counterclaims were substantively proper. The trial court dismissed the first counterclaim as an impermissible collateral attack upon the first judgment, and it granted summary judgment on the second counterclaim for essentially the same reasons. Those rulings were not appealed, nor do the Estate and Spangler Jennings now argue that they were flawed. Mayer was seeking, on behalf of his clients, damages from Lax and Lasco for their allegedly fraudulent conduct in procuring the first judgment. Again, "'a litigant defeated in a tribunal of competent jurisdiction may not maintain an action for damages against his adversary or adverse witnesses on the ground the judgment was obtained by false and fraudulent practices or by false and forced evidence.'" South Haven Sewer Works, Inc. v. Jones, 757 N.E.2d 1041, 1045 (Ind. Ct. App. 2001) (quoting Dodd v. Estate of Yanan, 625 N.E.2d 456, 457 (Ind. 1993)). Also, Mayer never sought to have the lawsuit in the first judgment set aside through the proper channels of a Trial Rule 60(B)(3) motion to set aside.

There is scant direct evidence that Mayer had ill will towards Lasco and wanted to harm his reputation by filing the counterclaims; the best evidence that Lax and Lasco can point to is that Mayer evidently inquired about Lasco's interest in the MTO casino before the counterclaim was filed, implying that Mayer was aware of that interest and wanted to harm it. In Lindsay, 574 N.E.2d at 326, we reversed a grant of summary judgment in favor of an abuse of process defendant where the plaintiff had submitted an affidavit averring that the defendant had told another person that it would cost the plaintiff more to defend against the allegedly abusive lawsuit than it would cost the defendant to bring it.

33

Thus, there was direct evidence in Lindsay that the defendant was improperly using litigation to harm the plaintiff. In Shortridge, however, the supreme court considered the fact that a lis pendens filing was entirely improper under Indiana law as sufficient to avoid summary judgment in favor of the attorneys who had filed the lis pendens notice and who were later sued for abuse of process. See Shortridge, 689 N.E.2d at 1253-54. Although there does not appear to have been direct evidence that the attorneys acted maliciously in filing the lis pendens notice, the supreme court said that "[a]n examination of the motivation behind the decision of the . . . attorneys to file the [lis pendens notice] is a question of fact that is subject to conflicting inferences." Id. at 1253. Here, even if there is no direct evidence that Mayer had an improper motive in filing the counterclaims, we conclude that it is enough to avoid summary judgment on Lax and Lasco's abuse of process claims that the counterclaims were so legally deficient and allegedly lacking in any factual basis as to create a genuine issue of fact as to whether Mayer had an improper motive in filing them. The trial court correctly denied the Estate and Spangler Jennings's motion for summary judgment on this claim.

### IV. *Punitive Damages*

Finally, the Estate and Spangler Jennings argue that the trial court erred in concluding that Lax and Lasco could seek punitive damages from them. Given our previous rulings, the question is whether a fact-finder could be permitted to award punitive damages against Spangler Jennings if it is found liable on the malicious

34

prosecution claim or against either the Estate or Spangler Jennings if they are found liable on the abuse of process claim.

Although the trial court stated that "Indiana law is silent" on the issue of whether a plaintiff can recover punitive damages from a deceased tortfeasor's estate, our supreme court did in fact directly rule on the issue in <u>Crabtree ex rel. Kemp v. Estate of Crabtree</u>, 837 N.E.2d 135 (Ind. 2005). The court reviewed numerous cases from other jurisdictions, the majority of which barred punitive damages in such situations, and held:

> We believe the majority view is persuasive and hold that Indiana law does not permit recovery of punitive damages from the estate of a deceased tortfeasor. The central purpose of punitive damages is to punish the wrongdoer and to deter him from future misconduct, not to reward the plaintiff and not to compensate the plaintiff. "[T]he plaintiff has no right or entitlement to an award of punitive damages in any amount. Unlike a claim for compensatory damages, the trier of fact is not required to award punitive damages even if the facts that might justify an award are found." <u>Cheatham v. Pohle</u>, 789 N.E.2d 467, 472 (Ind. 2003) . . . .

<u>Crabtree</u>, 837 N.E.2d at 139. The court did not believe that "affirmative justice thus would be done by allowing the deceased's innocent heirs to be punished for the wrongdoing of the decedent." <u>Id.</u> It did leave open the possibility that it might consider the availability of punitive damages "[i]f we ever encounter a case where a tortfeasor seems to have considered his own death as an escape from punitive damages incident to some intentional tort . . . ." <u>Id.</u>

Lax and Lasco argue that <u>Crabtree</u> is "distinguishable" from the present case. It is true that <u>Crabtree</u> dealt specifically with a situation where children of a deceased

35

tortfeasor were seeking punitive damages from their father's estate; the court noted that because punitive damages usually are excluded from insurance coverage, any such damages would be payable from the father's estate to the detriment of the heirs—the children—with their attorney and the State being the only net beneficiaries of an award of punitive damages. Id. at 139-40. However, it does not appear that the court intended to limit application of its holding to the particular fact pattern in that case, as opposed to making an observation as to why precluding recovery of punitive damages from a deceased tortfeasor's estate was "especially significant here . . . ." Id. at 139 (emphasis added). Instead, we believe the court clearly intended to establish a general rule that punitive damages are not recoverable from the estate of a deceased tortfeasor, with the only possible exception being if the tortfeasor committed suicide to attempt to escape such damages. There is no indication that Mayer committed suicide. The trial court erred in ruling that Lax and Lasco could attempt to recover punitive damages from the Estate.

We now turn to whether Lax and Lasco may attempt to recover punitive damages from Spangler Jennings. It is unclear in Indiana whether a plaintiff generally may recover punitive damages from a tortfeasor's employer strictly under respondeat superior principles, regardless of whether the tortfeasor is still alive or of any independent misconduct by the employer.[10] In Stevenson v. Hamilton Mutual Ins. Co., 672 N.E.2d

---

[10] In Infinity Products, Inc. v. Quandt, 775 N.E.2d 1144, 1154 (Ind. Ct. App. 2002), and Stroud v. Lints, 760 N.E.2d 1176, 1185 (Ind. Ct. App. 2002), this court directly held that a corporation may be held vicariously liable for punitive damages assessed against an employee. Transfer was granted in both cases

36

467, 474 (Ind. Ct. App. 1996), trans. denied, this court held that if an employer is held directly liable for punitive damages by virtue of its own misconduct, then an insurance company should not cover such damages, but if punitive damages are vicariously imposed solely because of an employee's misconduct, then insurance should cover them. Obviously, Stevenson proceeded on the assumption that punitive damages could be vicariously imposed against an employer for employee misconduct without any evidence of misconduct by the employer.

Stevenson relied upon Norfolk & W. Ry. Co. v. Hartford Acc. & Indem. Co., 420 F. Supp. 92 (N.D. Ind. 1976). In that case, the court extensively examined Indiana law concerning the imposition of punitive damages against corporations. It noted that the first Indiana Supreme Court cases to address the issue seemed to be inconsistent regarding whether a corporation can be held liable for punitive damages for an employee's misconduct on a purely vicarious basis, or whether some independent wrongdoing by corporate management was required. Norfolk, 420 F. Supp. at 95-96 (citing Jeffersonville R.R. Co. v. Rogers, 28 Ind. 1 (1867) and Jeffersonville R.R. Co. v. Rogers, 38 Ind. 116 (1871)). The Norfolk court also observed that cases from this court explained permitting awards of punitive damages against a corporation "as resting on the ground that since a corporation could not be held criminally liable, the assessment of punitive damages against it would not offend Indiana's prohibition against double punishment." Id. at 96 (citing Baltimore & Ohio S.W. R.R. Co. v. Davis, 44 Ind. App.

and both opinions were vacated, but in neither case did our supreme court address the question of holding an employer liable for punitive damages assessed against an employee.

37

375, 380, 89 N.E. 403, 405 (1909); Indianapolis Bleaching Co. v. McMillan, 64 Ind. App. 268, 270-71, 113 N.E. 1019, 1020 (1916); Nicholson's Mobile Home Sales, Inc. v. Schramm, 164 Ind. App. 598, 606, 330 N.E.2d 785, 791 (1975)).

In 1984, the General Assembly passed new legislation regarding punitive damages. In pertinent part, "It is not a defense to an action for punitive damages that the defendant is subject to criminal prosecution for the act or omission that gave rise to the civil action." Ind. Code § 34-24-3-3. This statute changed the existing common law rule automatically precluding both an award of punitive damages and criminal prosecution against one defendant. Cheatham v. Pohle, 789 N.E.2d 467, 472 n.3 (Ind. 2003). Thus, the continued validity of cases such as Davis, Indianapolis Bleaching, Nicholson's, and Norfolk is doubtful because they were based upon the abrogated common law rule. Also, as noted by the Norfolk court, the early cases from our supreme court are unclear on whether a corporation may be held vicariously liable for punitive damages based solely upon an agent's conduct, or whether there must be some independent misconduct by the corporation's management to support an award of punitive damages.

In attempting to discern what the law in Indiana should be on this question, we first note that other jurisdictions are very much in conflict on the issue. See generally 22 Am. Jur.2d Damages §§ 590-95 (2003); compare also Bierman v. Aramark Refreshment Servs., Inc., 198 P.3d 877, 884 (Okla. 2008) ("Punitive or exemplary damages may be assessed against an employer for an employee's act under the doctrine of respondeat superior. There is no requirement that an employer participate in or ratify the conduct of

an employee to be liable for punitive or exemplary damages under the doctrine of respondeat superior."), with Currie v. Cundiff, 870 F. Supp. 2d 581, 586 (S.D. Ill. 2012) (noting that under Illinois law, if liability of a corporation is premised upon respondeat superior, a plaintiff must show "complicity" of corporate management in acts of agent before punitive damages may be imposed against the corporation). The American Law Institute has embraced the "complicity" approach, as indicated by the following:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
>
> (a) the principal or a managerial agent authorized the doing and the manner of the act, or
>
> (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> (d) the principal or a managerial agent of the principal ratified or approved the act.

RESTATEMENT (SECOND) OF TORTS § 909 (1979); see also RESTATEMENT (SECOND) OF AGENCY § 217C (1958).

Turning to the current state of Indiana law on punitive damages, we first discuss our supreme court's decision in Orkin Exterminating Co., Inc. v. Traina, 486 N.E.2d 1019 (Ind. 1986). In that case, an exterminator employed by Orkin carried a modified firearm into a home while on business, against a supervisor's direct orders, where it accidentally discharged and injured the homeowner. A jury awarded the homeowner and

39

his wife $67,000 in compensatory damages and also awarded $400,000 in punitive damages against Orkin under respondeat superior. Our supreme court reversed the punitive damages award. It first listed general principles regarding punitive damages, including that they "are not compensatory in nature but are designed to punish the wrongdoer and to dissuade him and others from similar conduct in the future." Orkin, 486 N.E.2d at 1022. Further, punitive damages should be awarded only "with the realization that the plaintiff has already been awarded all that he is entitled to receive as a matter of law." Id. Anything that a plaintiff receives in addition to compensatory damages "is a windfall," and when deciding whether to allow recovery of punitive damages, "all thoughts of benefiting the injured party should be laid aside and the sole issues are whether or not the Defendant's conduct was so obdurate that he should be punished for the benefit of the general public." Id. Ultimately, the court found insufficient evidence of conscious and intentional misconduct in Orkin's hiring and retention of the employee and reversed the award of punitive damages. Id. at 1024. Orkin is not directly on point here. In that case it does not appear that the employee was alleged to have committed an intentional tort in the course of employment, as opposed to mere negligence, unlike Mayer. Still, the opinion overall does seem to embody skepticism about holding a corporation liable for punitive damages without some evidence that the corporation, through its management, engaged in some independent behavior warranting punitive damages.

The case of <u>Husted v. McCloud</u>, 450 N.E.2d 491 (Ind. 1983), is instructive. In that case, one partner in a law firm misappropriated client funds and was convicted of theft and forgery. His law firm subsequently was found liable in compensatory and punitive damages for the stolen funds. Analyzing the case under the Indiana Uniform Partnership Act, our supreme court held the firm was liable for compensatory damages; although the attorney's conversion of funds was not within the scope of the partnership's business, the acceptance of the client's funds and entrustment of them with the attorney was within said scope. <u>Husted</u>, 450 N.E.2d at 494. However, the court reversed the imposition of punitive damages against the firm. <u>Id.</u> at 495. It held, "Indiana prohibits awarding such damages against an individual who is personally innocent of any wrongdoing. Punitive damages are not intended to compensate a plaintiff but rather are intended to punish the wrongdoer and thereby deter others from engaging in similar conduct in the future." <u>Id.</u> Although not strictly speaking a respondeat superior case, <u>Husted</u> is persuasive authority for the proposition that our supreme court is not currently inclined to permit the vicarious imposition of punitive damages against a corporation or other principal in the absence of some evidence of managerial wrongdoing or "complicity" in an agent's wrongdoing.

We conclude that consistent with the purposes of punitive damages in Indiana, including deterrence of the person or entity against which they are imposed, such damages should not be imposed against a corporation strictly on the basis of respondeat superior for an employee's misconduct. In order to award punitive damages against the

41

employer, there must be evidence of positive or collusive action by the employer as indicated by the Restatement sections quoted above, such as prior authorization of the doing and the manner of the agent's act; that the agent was unfit and the employer was reckless in employing and/or retaining the agent; that the agent was employed in a managerial capacity and was acting within the scope of his or her employment when the tort was committed; or that the employer ratified or approved the agent's action after the fact. These situations are consistent with Indiana law that an award of punitive damages against an individual ordinarily requires a finding of willful and wanton conduct. Davidson v. Bailey, 826 N.E.2d 80, 89 (Ind. Ct. App. 2005).

Here, there is no evidence in the record that Spangler Jennings's management approved Mayer's filing of the counterclaims ahead of time because as a shareholder or "partner" in the firm, Mayer's actions generally were not approved ahead of time by a supervising attorney. Also, there is no evidence that Mayer was an unfit employee—i.e., there is no evidence that Mayer ever had, apart from the filing of the counterclaims, acted inappropriately in his employment. As for Mayer's managerial status, Lax and Lasco deposed Daniel Gioia, Spangler Jennings's managing attorney and president of the firm at the time the counterclaims were filed, who described the firm's management structure as consisting of a Board of Directors and an Executive Committee within the Board; Mayer was not mentioned as belonging to either the Board or the Executive Committee. Thus, Mayer's status as a shareholder in the firm was insufficient by itself to give him "managerial" status within the firm.

42

We do believe there are outstanding genuine issues of material fact as to whether Spangler Jennings's management ratified Mayer's actions and whether Mayer's actions met the requisite punitive damages standard of willful and wanton conduct. A principal's ratification of intentionally tortious conduct by an agent, as opposed to ratification of a contract, has rarely been addressed in Indiana. It appears to be accepted, however, that ratification of a tort must be made with full knowledge of the act, including its tortious character or the surrounding circumstances. 30 C.J.S. Employer-Employee Relationship § 199 (2007). Ratification may be inferred only from acts that clearly and unequivocally evince an intention to ratify. Id. Failure to discharge an employee who has committed misconduct may be evidence of ratification. Baptist v. Robinson, 49 Cal. Rptr.3d 153, 167 (Cal. Ct. App. 2006), rev. denied. "The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort . . . ." Id. An employer who has knowledge of an employee's course of conduct but does not reprimand or discipline the employee may be found to have ratified that conduct. 30 C.J.S. Employer-Employee Relationship § 199 (2007). "Whether an employer has ratified an employee's conduct is generally a factual question." Baptist, 49 Cal. Rptr. 3d at 167.

The designated evidence is that on August 25, 2005, after the amended counterclaim was filed, counsel for Lax and Lasco wrote a letter to Gioia, complaining that the counterclaims Mayer filed lacked any factual basis and were harming Lasco's business reputation and urging Spangler Jennings "to carefully review this situation and

43

take all necessary steps for mitigation of damages." App. p. 741. Gioia testified in his deposition that the firm's Executive Committee did in fact look into the matter, including whether there was any factual basis for the counterclaims.[11] The firm ended up taking no disciplinary action against Mayer. Also, Spangler Jennings retained the fees Mayer charged for preparing the counterclaims within a firm-wide pool and paid Mayer a salary; Mayer did not receive the fees directly. However, there currently is no designated evidence in the record that any of the allegations in the counterclaims were true and, thus, we assume for purposes of summary judgment that the allegations were baseless. Thus, again, viewing the evidence in a light most favorable to Lax and Lasco as summary judgment nonmovants, there is evidence that Mayer filed highly inflammatory accusations against Lax and Lasco with no factual basis, and that this was brought to the attention of Spangler Jennings management, who then investigated the matter but took no action against Mayer despite the lack of any factual basis for the counterclaims, while retaining the fees Mayer had charged for preparing them. This evidence raises genuine issues of material fact as to whether Spangler Jennings ratified willful and wanton conduct by Mayer and, therefore, the trial court correctly denied summary judgment to Spangler Jennings on the issue of punitive damages.

### Conclusion

The statements Mayer made in the counterclaims were covered by the absolute privilege for statements made during judicial proceedings. However, that privilege does

---

[11] Gioia refused to go into detail regarding what the Executive Committee learned, claiming that information to be privileged.

not bar Lax and Lasco's lawsuits for malicious prosecution and abuse of process. Additionally, even though the cause of action for malicious prosecution is barred against the Estate by the Survival Statute, that cause of action remains viable against Spangler Jennings. Also, the Estate and Spangler Jennings have not established that they are entitled to judgment as a matter of law on the abuse of process claim. Lax and Lasco cannot continue pursuing punitive damages against the Estate, but they can continue pursuing them against Spangler Jennings. Although Lax and Lasco may continue seeking recovery against Spangler Jennings on their malicious prosecution and abuse of process claims, they may do so only under a respondeat superior theory, not a direct liability theory.

We reverse the denial of summary judgment to the Estate and Spangler Jennings on the claims for negligent supervision and/or retention, tortious interference with a business relationship, and tortious interference with a contract, and direct that summary judgment be entered in the Estate's and Spangler Jennings's favor on those claims. We reverse the denial of summary judgment to Spangler Jennings on the defamation claim and direct that summary judgment be entered in its favor on that claim. We also reverse the denial of summary judgment to the Estate regarding Lax and Lasco's seeking of punitive damages against it and direct that summary judgment be entered in favor of the Estate on that claim. We affirm the granting of summary judgment in the Estate's favor on the defamation and malicious prosecution claims. We affirm the denial of summary judgment on the malicious prosecution claim against Spangler Jennings and the denial of

45

summary judgment on the abuse of process claim as to both the Estate and Spangler Jennings. We also affirm the denial of summary judgment in favor of Spangler Jennings on the punitive damages issue. We remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

NAJAM, J., and BAILEY, J., concur.