2019 IL App (1st) 181525

No. 1-18-1525

Opinion filed on September 24, 2019.

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| JAMES DENTON and THERESA DENTON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellees, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2015 L 1727 |
| | ) | |
| UNIVERSAL AM-CAN, LTD., a Corporation; | ) | The Honorable |
| DAVID LEE JOHNSON; and LOUIS | ) | Lorna E. Propes, |
| BROADWELL, LLC, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellants. | ) | |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a lengthy jury trial, plaintiffs, James and Theresa Denton, prevailed in their personal injury action against defendants, Universal Am-Can, Ltd. (UACL), Louis Broadwell, LLC (Broadwell), and David Lee Johnson (an employee of UACL and Broadwell),[1] for a vehicular accident that occurred in Jasper County, Indiana. Previously, we held that the

---

[1]Johnson is an employee of UACL for "safety purposes" and ensuring compliance with the Federal Motor Carrier Safety Regulations. See 49 C.F.R. § 390.5 (2018). He is a statutory employee of Broadwell for "purposes of payroll and workers' comp[ensation]."

substantive law of Indiana would govern this case in *Denton v. Universal Am-Can, Ltd.*, 2015 IL App (1st) 132905, ¶ 32 (*Denton I*). The jury awarded plaintiffs compensatory damages of $19,155,900, after it found that all defendants were negligent and that UACL was also negligent in hiring and retaining its employee, Johnson. In addition, the jury awarded punitive damages of $35 million, having determined that UACL's conduct was willful and wanton. Defendants subsequently moved for a judgment notwithstanding the jury's punitive damages verdict and a new trial. The trial court denied their motion and entered judgment in favor of plaintiffs.

¶ 2    Defendants now appeal, contending that the trial court failed to follow this court's mandate in *Denton I* when the trial court applied Illinois law to the issues of damages and admissibility of evidence related to the collateral source rule. Defendants also contend that the jury's punitive damages award is excessive, unsupported by the evidence, and fomented by inflammatory statements made by plaintiffs' counsel during closing argument. Last, they contend that Indiana law precludes recovery of the damages against UACL attributable to negligent hiring and retention because UACL admitted vicarious liability for Johnson's actions. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4                              *UACL Hires Johnson*

¶ 5    Even though this is the second time we will consider this matter, we will examine the facts fully because it is readily apparent that the facts as stated in the first appeal were inaccurately presented to this court based on incorrect facts and conclusions in a police report. Here, we will report the accurate evidence that was adduced at trial.

¶ 6    UACL is an international trucking company that leased semitrailers from Broadwell, an independent contracting company, to carry and transport freight. Johnson applied to be a

commercial truck driver for UACL on January 19, 2010. At that time, Nicole Perttunen, a safety coordinator for UACL,[2] reviewed Johnson's application. Her duties included determining whether Johnson was qualified to work for UACL based on the company's well-established safety standards. She would then either accept or reject his application. As part of that process, Perttunen obtained Johnson's driver qualification file from one of UACL's recruiters, which consisted of his certified application, motor vehicle record and background check, among other things. Johnson's file revealed the following disturbing negative information.

¶ 7    Johnson held a commercial driver's license from South Carolina even though he had never completed a truck driving course. Within three years of applying to UACL, Johnson was involved in four accidents, had three moving violations, and had his license suspended twice. Johnson's application only listed two accidents, no moving violations, and one license suspension. Within 10 years, he was employed by seven different companies, but his application listed six. And even though his application listed one termination, Johnson testified that he was never fired. Conversely, Johnson was actually terminated from four of those seven companies for reasons that included tailgating a motorist, a felony conviction, too many points on his license, and crashing into a vehicle after refusing to let it merge onto an interstate ramp. Regarding the last incident, Johnson testified, "I don't have to let nobody off a ramp."

¶ 8    In the seven years prior to applying at UACL, Johnson was convicted of nine traffic-related offenses, notably, three for speeding and one for speeding more than 10 miles per hour over the speed limit. Additionally, he was convicted of disobeying an official traffic device, failing to pay a speeding ticket or otherwise appear, turning unlawfully, improperly parking, and not wearing a seatbelt. Johnson was also convicted of four counts of "felony reckless aggravated

_____

[2]Perttunen was an official employee of UACL's parent company, Universal Truckload Services, Incorporated.

assault" on November 29, 2004, for attempting to break, with a tire thumper, the headlights on a vehicle occupied by four women. Johnson testified that while he was driving a truck, a car was tailgating him on the highway with its high beams on so he pulled off "to bust its headlights *** for blinding [him]." Johnson testified that as a result of the conviction, he learned to ignore those "ignorant people, out [there] on the interstate, that don't know nothing about driving a truck." Three weeks later, Johnson was convicted of "misdemeanor assault and battery of high and aggravated nature."

¶ 9       Perttunen testified that Johnson's felony conviction, having occurred within the last 10 years, automatically disqualified him under UACL's safety standards.[3] Consequently, she rejected his application. After Perttunen rejected any potential employee application, the process called for a recruiter to put that driver's qualification file into the company's "no-hire" file and inform the applicant of UACL's decision. Instead, the file went to Doug Moat, UACL's safety director. Moat acknowledged Perttunen's "unequivocal" rejection but nonetheless considered Johnson's application. Moat admitted that Johnson was but a "marginal candidate," conceding that UACL was forced to accept "marginal drivers" in order to make a profit. Regarding Johnson's felony conviction, Moat testified that it was "directly related" to Johnson's occupation as a professional truck driver. Furthermore, Moat agreed that Johnson "never should have been allowed to drive a UACL rig" under the company's standards. Yet, he still hired Johnson on February 3, 2010.

¶ 10                           *UACL Retains Johnson*

¶ 11      Pursuant to UACL's policy, drivers were required to attend a safety orientation within a week of being hired. Johnson took a slower approach, waiting nearly a month to attend. Johnson

---

[3]We note there is conflicting testimony regarding UACL's automatic disqualification time period for felony convictions; however, the record supports Perttunen's testimony that it was a 10-year period and defendants do not dispute this fact on appeal.

received five warning violations a few weeks later and consequently was put on probation for six months. During that time, Johnson was required to attend a safety meeting before he could be dispatched. Furthermore, Moat advised Johnson: "If you have any additional moving violations, accidents or safety incidents, we will be forced to revoke your driving privileges under [UACL] authority." Johnson failed to attend the mandatory safety meeting and, within weeks, received a speeding ticket, three moving violations, a logbook violation, and had his license suspended over the next nine months. UACL not only continued to employ Johnson, but it also dispatched Johnson while his license was suspended. Moat testified that after Johnson was hired, UACL "never ran" his motor vehicle report or monitored his license, which meant that UACL never made itself aware of the various deficiencies detailed there.

¶ 12    UACL also had a policy that assessed a different number of points for every violation, accident, or safety incident. For each instance, the corresponding number of points would be added to the driver's record where it would remain for 30 months. According to Moat, a driver who had more than 30 points on his record would be terminated. As for Johnson, he was not terminated despite having at least 36 points on his record that year.

¶ 13                                    *Accident*

¶ 14    On February 8, 2011, George Kallis, now deceased, was driving the wrong way on an interstate highway in Indiana. As a result, two vehicles swerved off the road but effectively avoided Kallis and any other vehicles. Meanwhile, Johnson was in the left lane, driving a truck above the speed limit on a suspended license. Johnson had "no idea" there was a wrong-way driver but still crashed into the Jeep ahead of him occupied by James Denton. That collision pushed the Jeep into the right lane where it slammed into the fuel tank of another semitruck. James testified, "I sure did feel it because I hit his fuel tanks and diesel fuel went everywhere,

including all over me, the inside of the car, my eyes, everywhere." After James eventually managed to crawl out the rear passenger window, he was taken to Jasper County Hospital.

¶ 15    After the accident, James suffered from multiple traumatic injuries, resulting in post-traumatic stress, depression and anxiety. James underwent nine surgeries, which included spinal fusions, as well as three knee surgeries. He now has a prosthetic metal knee. In addition, James sustained severe nerve damage and consequently had spinal surgery to open his nerve canals, which was unsuccessful. Due to the nerve damage, James experienced urinary incontinence and ultimately sustained a neurogenic bladder. James regularly has to catheterize himself and wear adult diapers, which, in turn, has negatively impacted his marriage and strained relationships with his children and grandchildren. James has been unable to work since the accident and regularly takes Norco to manage his pain as an alternative to wearing fentanyl patches, which left him with debilitating side effects. James also continues to see a counselor for depression and anxiety.

¶ 16                                  *Verdict*

¶ 17    The record reveals that the jury was instructed on Indiana law as it applied to punitive damages, gross negligence, comparative fault and contribution liability. As such, the verdict form that was provided to the jury allowed the jury to find Kallis liable by ascribing a percentage of negligence owing to his conduct. Following deliberations, the jury found in favor of plaintiffs on their negligence claim against Johnson, individually and as an agent of Broadwell and UACL, and assigned 40% of the fault to Johnson, Broadwell and UACL for that claim. In addition, the jury found in favor of plaintiffs on their claim for negligent hiring and retention against UACL and assigned 60% of the fault to UACL for that claim. The jury specifically assigned 0% fault to Kallis.

¶ 18    The jury awarded James compensatory damages in the total amount of $16,095,900, which included: $1,178,900 for reasonable expenses of necessary medical care, treatment and services rendered; $2,917,000 for present cash value of earnings reasonably certain to be lost in the future; $6 million for pain and suffering experienced and reasonably certain to be experienced in the future; and $6 million for the disability experienced and reasonably certain to be experienced in the future. The jury awarded Theresa compensatory damages in the total amount of $3,060,000, which included: $60,000 for reasonable value of the services of her husband which she has been deprived and the present cash value of the services reasonably certain to be lost in the future, and $3 million for the reasonable value of the society, companionship and sexual relationship with her husband of which she has been deprived and reasonably certain to be deprived of in the future.

¶ 19    In addition, the jury found that UACL's conduct was willful and wanton related to its hiring and retention of Johnson and awarded James $35 million in punitive damages. The trial court subsequently entered judgment in the amount of $7,662,360 against defendants, and $11,493,540 against UACL for compensatory damages, as well as $35 million against UACL for punitive damages.

¶ 20                              *Posttrial Motion*

¶ 21    Defendants filed a posttrial motion raising multiple claims, including a request for a judgment notwithstanding the jury's punitive damages verdict, a new trial, and alternatively, a remittitur of the jury's punitive damages award. After conducting extensive briefing on the matter and hearing arguments from the parties, the trial court denied defendants' posttrial motion on June 18, 2018. Defendants now appeal.

¶ 22                              ANALYSIS

¶ 23    As stated, defendants first challenge the trial court's actions in light of this court's mandate in *Denton I*. Before proceeding to the merits, however, we must address defendants' flagrant disregard for the Illinois Supreme Court Rules, which are mandatory, not optional. *Miller v. Lawrence*, 2016 IL App (1st) 142051, ¶ 18. Even a casual reader of defendants' statement of facts would find it chockablock with argumentative, conclusory allegations like this: "[t]here is nothing in Johnson's driving history that would suggest he was a dangerous truck driver." Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018) provides that the appellants' statement of facts must be "stated accurately and fairly without argument or comment." Accordingly, we will not consider any statements made by defendants that are argumentative or without reference to the record. *Beitner v. Marzahl*, 354 Ill. App. 3d 142, 146 (2004).

¶ 24    Furthermore, defendants' overly emphatic and inarguably hyperbolic brief failed to include the applicable standards of review for the issues raised on appeal, in violation of Illinois Supreme Court Rule 341(h)(3) (eff. May 25, 2018). That rule provides that the appellants "must include a concise statement of the applicable standard of review for each issue, with citation to authority." *Id.* And, where a standard of review was provided, it was erroneous. For example, in challenging the denial of their requests for a new trial and a remittitur, defendants provided only the *de novo* standard of review, when it is well settled that neither request for relief is reviewed under that standard, as will be discussed in more detail below. Undaunted, defendants' reply brief paid no heed to these "few minor technical deficiencies," in violation of Illinois Supreme Court Rule 341(j) (eff. May 25, 2018). We reemphasize that this court is not a repository into which appellants may foist the burden of argument and legal research. *Melamed v. Melamed*, 2016 IL App (1st) 141453, ¶ 21.

¶ 25 Defendants are not alone in this regard and have correctly observed that plaintiffs' brief violates Illinois Supreme Court Rule 341(a) (eff. May 25, 2018), insofar as the text appears to be printed in 11-point typeface, rather than the required 12-point minimum. Although apparently a minor deficiency, this error carries more weight given that plaintiffs failed to file a motion to submit their brief in excess of the required 50-page limit pursuant to Illinois Supreme Court Rule 341(b) (eff. May 25, 2018), and instead, elected to utilize the smaller typeface as an end run around our authority and the requirements. While we cannot condone these practices and caution all parties to refrain from such noncompliance going forward, we will proceed to consider the merits of defendants' appeal.

¶ 26                                  Denton I

¶ 27 Defendants contend that the trial court failed to adhere to this court's mandate in *Denton I* because the trial court applied Illinois law to the issue of damages when it excluded evidence under the collateral source rule. We disagree and proceed in our *de novo* review. See *People ex rel. Department of Transportation v. Firstar Illinois*, 365 Ill. App. 3d 936, 939 (2006).

¶ 28 Where, as here, this court's mandate remands for further proceedings consistent with the opinion, then the lower court must examine the content of the opinion and proceed in any manner that is not inconsistent with our judgment. See *id*.; *Pioneer Trust & Savings Bank v. Zonta*, 96 Ill. App. 3d 339, 344 (1981). Having carefully reviewed the record in light of *Denton I*, we cannot say that the trial court's actions were inconsistent with our judgment. *Cf. Aardvark Art, Inc. v. Lehigh/Steck-Warlick, Inc.*, 284 Ill. App. 3d 627, 632 (1996) (holding that the trial court failed to follow the reviewing court's mandate "for a new trial on the issue of damages only" by allowing the jury to address liability on remand).

¶ 29    In *Denton I*, we held that "the substantive law of Indiana" would apply in this case. *Denton I*, 2015 IL App (1st) 132905, ¶ 32. Our mandate therefore reversed the lower court's ruling in favor of Illinois substantive law and "remand[ed] for further proceedings consistent with this opinion." *Id.* It did not, however, provide the trial court with *specific* instructions as to how to proceed on the issue of damages. As such, the trial court had to examine our decision and proceed in any manner that was not inconsistent with it. We acknowledge our statement earlier in the opinion that "Indiana law governs the liability and damages issues in this case." *Id.* ¶ 1. In the context of our analysis, however, that statement refers to Indiana law regarding the apportionment of damages for contribution liability. See *id.* ¶ 13 ("the two states present substantially different ways of apportioning fault and damages"). Compare *id.* ¶ 10 ("Under Illinois's joint and several liability law, if Johnson were found responsible for 25% of the damages caused to plaintiffs, then he could nonetheless be responsible for the full amount of damages."), with *id.* ¶ 11 ("Indiana, by contrast, maintains that defendants can only be held severally liable for their own percentage of fault."). And notably, "Indiana law allows a defendant to prove the negligence of an absent or settling tortfeasor." *Id.*

¶ 30    It bears repeating that the two main issues defendants were focused on in the earlier appeal centered around the difference in each state's law as it related to contribution liability and the ability to have a nonparty's conduct addressed on the verdict form. Our ruling mandated that Indiana law as it related to several liability would be applied at trial and that Kallis' name would be on the verdict form pursuant to Indiana law. Ergo, defendants got just what they asked for. Here, the trial court applied Indiana law to the issues of contribution liability and apportionment of fault and damages. Furthermore, defendants were allowed to argue, albeit unsuccessfully, that

the accident was caused entirely by Kallis' negligence in driving the wrong way on the interstate. Accordingly, we conclude that the trial court's actions conformed to our judgment and mandate.

¶ 31    Even assuming *arguendo*, that the trial court's actions were improper, that is of no import as defendants' entirely specious argument ignores that the admissibility of damages is an evidentiary issue, which, in this case, is governed by Illinois law. The law of the forum governs the admissibility of a particular piece of evidence, particularly when that evidence is subject to exclusion under a local rule. *Christopherson v. Hyster Co.*, 58 Ill. App. 3d 791, 802 (1978); *People v. Saiken*, 49 Ill. 2d 504, 509 (1971); see Restatement (First) of Conflict of Laws § 597 (1934); see also Restatement (First) of Conflict of Laws § 597 cmt. a (stating that "the court at the forum applies the local rule of exclusion of evidence").

¶ 32    To that end, the trial court correctly barred testimony regarding the reduced rates providers accepted for James' medical treatment under the collateral source rule. In Illinois, the collateral source rule prevents defendants from introducing any evidence that plaintiffs' losses are subject to or have been covered by insurance or other independent sources. *Wills v. Foster*, 229 Ill. 2d 393, 399-400 (2008); *Arthur v. Catour*, 216 Ill. 2d 72, 78 (2005). Notably, in their motions for summary judgment and posttrial relief, defendants conceded that "[p]rocedural and evidentiary issues are governed by the law of the forum, in this case, the law of Illinois."[4] And, in their brief, defendants acknowledge that the trial court's rulings were consistent with Illinois law, which "prohibits a jury from knowing the reduced rates providers accept based on the collateral source rule." Accordingly, we find no error.

_____

[4]Interestingly, defendants insisted on applying Illinois law when it was to their benefit, arguing in their posttrial motion that: "Illinois Evidentiary Law Should Be Juxtaposed with Indiana Law and Result in Barring the Presentation of Prejudicial and Confusing Evidence about Mr. Johnson." *Cf. Powell v. Dean Foods Co.*, 2013 IL App (1st) 082513-B, ¶¶ 101, 116-17 (holding that the introduction of the truck driver's prior bad acts was improper where there was no claim for punitive damages). Regardless, the jury in this case was instructed to consider any evidence of Johnson's prior convictions only insofar as it related to plaintiffs' negligent hiring and retention claim against UACL.

¶ 33                                    *Negligent Hiring and Retention*

¶ 34    We also reject defendants' claim that a company's acceptance of vicarious liability for the alleged negligence caused by its employee categorically relieves that company of any additional liability for negligent hiring and retention, finding their reliance on *Sedam v. 2JR Pizza Enterprises, LLC*, 84 N.E.3d 1174, 1179 (Ind. 2017), misplaced.

¶ 35    Initially, we note that *Sedam* involved the lower court's summary judgment ruling on the plaintiffs' negligent hiring and retention claim, not a jury's damages award assessed on that claim. *Id.* at 1176. In any event, while the *Sedam* court found that generally, a claim for negligent hiring and retention may not be pursued in conjunction with a negligence claim under the doctrine of *respondeat superior* when an employer admits liability, it also acknowledged that both claims have been permitted under "special circumstances." See *id.* at 1177-78 (finding that special circumstances likely exist when ordinary *respondeat superior* principles would fail). As noted by the *Sedam* court, that exception was delineated in *Tindall v. Enderle*, 320 N.E.2d 764, 768 (Ind. Ct. App. 1974).[5] *Sedam*, 84 N.E.3d at 1177-78. There, the *Tindall* court explained that "[t]he sole possible advantage to the pursuit of a negligent hiring theory in cases such as that before us would be the potential assessment of punitive damages." *Tindall*, 320 N.E.2d at 768.

¶ 36    In Indiana, punitive damages cannot be imposed against an employer "strictly on the basis of *respondeat superior* for an employee's misconduct." *Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238, 261 (Ind. Ct. App. 2013). Conversely, "there must be evidence of positive or collusive action by the employer," as Indiana has adopted the Restatement (Second) of Torts for vicarious liability. *Id.* at 260-61. Section 909(b) provides, in relevant part, that punitive damages may be properly awarded against a principal because of an act by an agent where "the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him."

_____

[5]The *Sedam* court reaffirmed *Tindall*, finding it "controlling." *Sedam*, 84 N.E.3d at 1178.

Restatement (Second) of Torts § 909(b) (1979). That rule "results from the reasons for awarding punitive damages, which make it improper ordinarily to award punitive damages against one who himself is personally innocent and therefore liable only vicariously." *Id.* § 909 cmt. b.

¶ 37    As set forth above, defendants were allowed to argue that Kallis was the "sole protagonist" in this case and that his actions, not Johnson's, were responsible for plaintiffs' injuries. Had defendants been successful, plaintiffs' *respondeat superior* claim likely would have failed as it was contingent upon finding Johnson negligent. Moreover, without their negligent hiring and retention claim, plaintiffs would have been unable to seek punitive damages against UACL under Indiana law. Based on the foregoing, we conclude that "special circumstances" existed in this case. Accordingly, we find no error.

¶ 38                                 *Punitive Damages Award*

¶ 39    Defendants contend that the trial court erroneously denied their motion for a directed verdict and posttrial relief[6] because the punitive damages award is unsupported by the evidence. Specifically, they argue that plaintiffs failed to show UACL consciously disregarded a known safety risk by employing Johnson. Contrarily, plaintiffs argue that Johnson was the proverbial accident waiting to happen.

¶ 40    There are well-established standards to be used in determining whether a directed verdict, judgment notwithstanding the verdict, or a new trial should be granted. *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). A directed verdict or judgment notwithstanding the verdict is appropriate only when all of the evidence, when viewed in the light most favorable to the nonmoving parties, so overwhelmingly favors the movants that no contrary verdict based on that evidence could ever

---

[6]To the extent defendants assert that the circuit court erred in denying summary judgment on plaintiffs' punitive damages claim, this issue was decided at trial; thus, any error in that denial merged into the final judgment. *Mansmith v. Hameeduddin*, 369 Ill. App. 3d 417, 425 (2006). Accordingly, their claim is not subject to our review. *Id.*

stand. *Id.* (citing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). Simply put, a judgment notwithstanding the verdict should not be granted unless there is a total failure or lack of evidence to prove any necessary element of the plaintiffs' case. *Neuhengen v. Global Experience Specialists, Inc.*, 2018 IL App (1st) 160322, ¶ 132. In contrast, a motion for a new trial should not be granted unless the jury's verdict is against the manifest weight of the evidence, *i.e.*, only when the opposite conclusion is clearly evident or the jury's findings are unreasonable, arbitrary and not based upon any of the evidence. *Id.* ¶ 76.

¶ 41    In Indiana, punitive damages may be awarded upon a showing of "willful and wanton misconduct, which, under existing conditions, the [defendant] knows will probably result in injury." *Gray v. Westinghouse Electric Corp.*, 624 N.E.2d 49, 54 (Ind. Ct. App. 1993). Notably, "[w]illful and wanton misconduct need not include malice or intent to injure." *Id.* at 54-55. And, punitive damages are justified when the defendant's conduct amounts to gross negligence, not resulting from a mistake of law or fact, honest error of judgment, overzealousness, mere negligence or other noniniquitous human failing. *Id.* at 55; *Westray v. Wright*, 834 N.E.2d 173, 179-80 (Ind. Ct. App. 2005). The Indiana Supreme Court has defined gross negligence as a "conscious, voluntary act or omission in reckless disregard of … the consequences to another party." (Internal quotation marks omitted.) *Westray*, 834 N.E.2d at 180.

¶ 42    Here, defendants have not shown that there was insufficient evidence to support the jury's punitive damages award. As set forth above, the jury was presented with extensive evidence regarding Johnson's history prior to applying at UACL, as well as UACL's internal safety policies. Despite Johnson's history, UACL nevertheless hired him, even though doing so violated its own company policies.[7] *Cf. id.* at 181 (holding that there was insufficient evidence to

---

[7] In arguing that evidence showing an employer violated its own company policy is insufficient to support an award of punitive damages, defendants' reliance on *Wanke v. Lynn's Transportation Co.*, 836

support the jury's punitive damages award based on wrongful hiring where the driver was qualified under the company's exceptionally strict standards). To the extent defendants argue that Johnson's history never involved substantially similar conduct to that at issue here, this is belied by Moat's testimony that Johnson's felony conviction was "directly related" to his occupation as a professional truck driver.

¶ 43    Furthermore, UACL retained Johnson after he continued to violate its policies and specifically neglected to monitor Johnson's commercial driver's license or motor vehicle record after he was hired. That failure resulted in Johnson driving a truck on a suspended license when he hit James. Given the foregoing, we cannot say that the jury's punitive damages verdict was against the manifest weight of the evidence or that the evidence was insufficient to support the award.

¶ 44    In the same vein, we reject defendants' claim that the jury's verdict is against the manifest weight of the evidence because it failed to assign any fault to Kallis. To set aside the jury's verdict on that basis, defendants would have this court substitute its view for that of the jury, which clearly did not believe that Kallis' conduct was a cause of the accident between Johnson and James' vehicles. Thus, the jury in this case clearly disagreed with defendants' oft-stated position that Kallis was the "principal protagonist in the accident." More importantly, our observation in *Denton I* that Kallis "was the precipitating factor in the accident" was the product of arguments made by defense counsel in their brief that largely stemmed from a police report that was inaccurate, misleading and was never admitted into evidence at trial. According to defendants, that police report had stated:

F. Supp. 587, 601-02 (N.D. Ind. 1993), is misplaced and not binding on us or our supreme court. See *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 835 (2004); *cf. Wanke*, 836 F. Supp. at 601-02 (where the employer violated its company policy by hiring a driver with less than two years' experience, the court found there was insufficient evidence that the driver was inherently unsafe or that the employer knowingly hired an unsafe driver to justify the imposition of punitive damages).

"***Once at the 225 MM, V1 [Kallis] caused a major crash.*** \*\*\* Both V4 [Byro] and V5 [Harris] slowed to avoid V1 [Kallis]. Both V4 and V5 moved to the right to allow [Kallis] by and pass. As this was happening, V3 [Denton] did not see what was going on and struck V4 in his \*\*\* tires and fuel tank on the V4's driver side. V4 pulled onto the emergency lanes and came to a stop. [Denton] was in the middle of I-65 after hitting V4. V2 [Johnson] rear-ended [Denton] and shoved [Denton] into the rear trailer of V5. V5 came to a rest in the passing lane of I-65."

Conversely, Kallis caused two vehicles to swerve off the road, neither of which crashed into other vehicles. Michael Twardak, the driver of one of those vehicles, had swerved off to the left, where he "ran into the police turn-around \*\*\* and landed in a snow pile." Matthew Singan, the other driver, had swerved to the right, where he hit the guardrail, but then pulled off the highway and called the police from a nearby gas station. Additionally, Johnson testified that he had "no idea" there was a wrong-way driver when he crashed into James, who incidentally was driving in the left lane, not the middle, of the two-lane highway. Furthermore, Johnson's testimony was corroborated by Moat, who confirmed that UACL's internal accident report indicated Johnson had no knowledge of a wrong-way driver, as set forth above.

¶ 45    Similarly, we reject defendants' claim that the jury was required to "apportion fault to Kallis because he drove his car in violation of the law." But *cf. First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257, 260-61 (1999) (holding that the defendants' illegally parked truck constituted a condition, as opposed to a legal cause, that made the plaintiff's injury possible by the subsequent third party). Under Illinois and Indiana law, it is well settled that where a party's alleged negligence merely furnishes a condition by which the subsequent injury producing acts of another are made possible, the existence of the first condition cannot be the proximate cause

of the injuries but is a remote cause. *Id.*; see also *Walker v. Jones*, 511 N.E.2d 507, 509 (Ind. Ct. App. 1987). As established *supra*, there was sufficient evidence to support the jury's verdict that assigned no fault to Kallis, and defendants have offered only speculation that the jury disregarded the instructions on that basis.[8] Accordingly, we conclude that the jury's verdict was not against the manifest weight of the evidence.

¶ 46    This does not end our analysis of this issue, however, as defendants alternatively contend that the jury's award of $35 million for punitive damages was unconstitutionally excessive. Plaintiffs respond, and we agree, that defendants have forfeited this issue by failing to raise it in their posttrial motion. A posttrial motion must set forth the specific grounds for any alleged error and where the parties fail to raise an issue in their motion for posttrial relief, that issue is forfeited on appeal. *Calabrese v. Benitez*, 2015 IL App (3d) 130827, ¶ 21; *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344, 348-49 (1980). As noted by the trial court in ruling on their posttrial motion, defendants "didn't make an argument *** about excessive punitive damages, just that the punitive damages award was driven by the mistakes in the closing argument." Accordingly, we conclude that defendants have forfeited their claim.

¶ 47    Forfeiture aside, defendants have not demonstrated that the jury's punitive damages award is excessive. It is well settled that the amount of damages to be assessed is quintessentially a question of fact for the jury to determine. *Neuhengen*, 2018 IL App (1st) 160322, ¶ 169. As such, we will not reverse a jury's award of punitive damages unless it is against the manifest weight of the evidence, *i.e.*, only when the amount awarded is so excessive that it demonstrates passion, partiality, or corruption on the part of the jury. *Leyshon v. Diehl Controls North*

---

[8]We note that during oral argument, defense counsel conceded that Kallis' violation of the Indiana Code or Federal Motor Carrier Safety Regulations could be excused if that violation constituted a condition, rather than a legal cause, that made plaintiffs' injuries possible by the subsequent acts of Johnson.

*America, Inc.*, 407 Ill. App. 3d 1, 13 (2010). Having determined that the jury's punitive damages award was not against the manifest weight of the evidence, we conclude the trial court properly denied defendants' request for a remittitur.

¶ 48    Defendants also contend that plaintiffs' counsel engaged in a pattern of misconduct during closing argument by making several improper comments that substantially prejudiced defendants. Defendants thus contend that the cumulative effect of those comments warrants a new trial. Improper comments do not constitute reversible error unless they were so prejudicial that defendants were deprived of a fair trial. *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 95 (2008). Furthermore, we will not reverse a trial court's determinations regarding the prejudicial effect of comments made during closing argument absent a clear abuse of discretion. *Id.*

¶ 49    First, defendants argue that plaintiffs' counsel inflamed the jury by referring to the now infamous pedophilic priest scandal, relying on the decision in *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 947-48 (2000). We find *Copeland* distinguishable. There, the plaintiff's counsel repeatedly referred to the Rachel Barton case during closing argument and compared the facts of that case, which were not in evidence, to those of the plaintiff's case. *Id.* After the trial court sustained two objections, the plaintiff's counsel, nonetheless, continued to make comparisons that were also not based on the evidence. *Id.* at 948. The *Copeland* court ultimately held that the "repeated reference[s] directly or indirectly to the Rachel Barton case, even after objections were sustained," constituted reversible error. *Id.* at 948-49.

¶ 50    In contrast, here, plaintiffs' counsel made one broad reference to the widespread pedophilic priest scandal: "[t]hat's like having \*\*\* a pedophile [*sic*] priest be transferred from one Archdiocese to the other." He also did not refer to a specific case, despite defendants'

suggestion that the comment clearly implicated a particular case that was then in the news. Moreover, the trial court immediately sustained defendants' objection and instructed the jury to disregard plaintiffs' counsel's statement. And, while that statement would surely have been better left unsaid, we find that any prejudicial impact of this alleged error was cured. See *First National Bank of La Grange v. Glen Oaks Hospital & Medical Center*, 357 Ill. App. 3d 828, 841 (2005).

¶ 51    Second, defendants argue that plaintiffs' counsel invited the jury to consider themselves as "plaintiffs' partners" by stating that James had a contract with "[e]ach and every one of you." The trial court overruled defendants' objection, finding the comment was merely "a figure of speech." Defendants have failed to show, let alone argue, any prejudicial effect of that comment.

¶ 52    Likewise unavailing is defendants' claim that plaintiffs' counsel improperly commented on the allocation of a punitive damages award in violation of Indiana law, as we previously determined that Illinois law was correctly applied to this issue.[9] Regardless, the jury was properly instructed on the applicable law for punitive damages as noted above. See *People v. Jackson*, 2012 IL App (1st) 092833, ¶ 36 (finding that a misstatement of the law during closing argument, while improper, generally does not constitute reversible error if the jury was properly instructed on the law). For the reasons set forth above, we find that the remarks by plaintiffs' counsel during closing argument do not constitute reversible error.

¶ 53    In sum, our mandate, stated simply, was that Indiana law should govern the issue of contribution liability, which is specifically what defendants requested. In *Denton I*, we noted there was a disparity in the law between the two states that operated to the disadvantage of defendants if Illinois law were applied. Most notably, this related to the ability to have the jury

_____

[9]We note that defendants' claim relies on section 34-51-3-3 of the Indiana Code (Ind. Code Ann. § 34-51-3-3 (West 2018)), which governs "Restrictions on jury instructions," not closing arguments.

consider the percentage of fault, if any, for a nonparty and to have fault determined on the basis of several liability, as opposed to joint and several liability. Defendants steadfastly claimed that it was "beyond peradventure" that Kallis would not be found to be the principal cause of this roadway accident. The trial court accommodated defendants at each and every turn as related to this mandate. Despite these proper rulings, defendants were simply unable to prove that any of Kallis' conduct was a proximate cause of the injuries suffered by James. Simply put, the jury's finding of zero percent fault on Kallis' part, reflects its belief that James was injured as a result of the conduct of defendants owing to the negligent operation of the semitractor trailer truck and the willful and wanton retention of an obviously unqualified and dangerous over-the-road truck driver.

¶ 54    Similarly, while defendants argued that the punitive damages award was "excessive," the trial court gave all instructions on Indiana law related to this singular issue and defendants failed to raise the issue of excessiveness in their posttrial motion. Defendants' claims therefore must fail.

¶ 55                                CONCLUSION

¶ 56    Based on the foregoing, the judgment of the trial court is affirmed.

¶ 57    Affirmed.

---

**No. 1-18-1525**

---

| | |
|---|---|
| **Cite as:** | *Denton v. Universal Am-Can, Ltd.*, 2019 IL App (1st) 181525 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2015-L-1727; the Hon. Lorna E. Propes, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Carlton D. Fisher and Stephen R. Swofford, of Hinshaw & Culbertson, LLP, of Chicago, and Morley Witus and Kevin M. Aoun, of Barris, Sott, Denn & Driker, PLLC, of Detroit, Michigan, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Robert J. Napleton, of Motherway & Napleton, L.L.P., of Chicago, Christopher T. Theisen and James M. Roche, of Theisen & Roche, of Wheaton, and Lynn D. Dowd, of Naperville, for appellees. |

---